## HONOLULU CONSTRUCTION AND DRAYING COMPANY, LIMITED, *v.* CITY AND COUNTY OF HONOLULU.

### No. 1853.

ARGUED FEBRUARY 7, 1929.     .     DECIDED MARCH 6, 1929.

PERRY, C. J., BANKS AND PARSONS, JJ.

OPINION OF THE COURT BY BANKS, J.

According to the agreed statement of facts upon

which this case is submitted, the trustees of the Bishop estate, on the 27th day of January, 1917, entered into an agreement of lease with the Honolulu Construction and Draying Company for a period of ten years from July 1, 1918. The property covered by the lease was a quarry site consisting of 19.93 acres of land at Kapaakea, in the City and County of Honolulu. On the 12th day of December, 1918, the construction company entered into an agreement with the City and County of Honolulu by which the construction company was to furnish crushed rock to the City and County of Honolulu at a stipulated price. One of the inducements which led the construction company to make this agreement was the dismissal by the city and county of a proceeding which it had instituted for the purpose of condemning (for a public use) a portion of the property included in the lease. The agreement contains the following provisions which are necessary to be considered in determining the rights of the parties: "Whereas, the premises sought to be condemned in said action include part of the premises described under that certain lease to said party of the second part from William O. Smith, E. Faxon Bishop, Albert F. Judd, William Williamson and Richard H. Trent, trustees under the will and of the estate of Bernice Pauahi Bishop, deceased, said lease being dated December 27th, 1917, and being Bishop Estate Lease No. 2000 on file in the office of said trustees; and whereas by the terms of said lease said party of the second part took possession of part of said premises on May 1st, 1918, and of the balance of the premises described in said lease on June 1, 1918, and said party of the second part now has a plant in operation adjoining said quarry and is prepared to extend the same and continue in operation during the period of its lease upon proper settlement of the present litigation aforesaid; now therefore, in consideration of

the covenants hereinafter contained by the party of the first part to be performed, and subject to all of the terms of this contract as hereinafter recited, the party of the second part, for itself, its successors and its successors in title to said lease or any part thereof, during its term, or of any renewal or extension thereof, hereby covenants with the party of the first part and its successors as follows:" (Then follows the agreement of the construction company to furnish crushed rock to the city and county at a certain price.)

On May 31, 1928, the trustees of the Bishop estate and the construction company entered into another agreement of lease for a period of five years from July 1, 1928, of the same property included in the prior lease and additional property, making the total area of the leased property 47.91 acres. On June 26, 1928, the construction company notified the engineer of the City and County of Honolulu by letter that its original lease from the trustees of the Bishop estate would expire on June 30 and that it had been given a new lease taking in a much larger area; that under the terms of the new lease crushed stone under present conditions would cost fifteen to twenty cents per cubic yard more than under the old lease, and that thereafter the construction company would advance the price at which it had agreed to furnish crushed stone to the City and County of Honolulu fifteen cents per cubic yard. From the 1st day to the 31st day of July, 1928, the city and county ordered and received from the construction company 2852 cubic yards of crushed stone, for which bills were rendered aggregating $5097.98. This was $443.55 more than the construction company was entitled to if its contract with the city and county, to which reference has been made, was still in force. The city and county paid to the construction company the sum of $4654.43 but declined to pay the balance of $443.55. It

is this balance which constitutes the subject matter of the present litigation.

It appears from the last clause of the contract above quoted that the construction company agreed that the covenants entered into by it (which included the price at which it would furnish crushed rock to the city and county) should be binding during the term of the lease it then had or during any *"renewal or extension"* of said lease. The liability, therefore, of the city and county for this balance of $443.55 depends on whether the last agreement of lease between the trustees of the Bishop estate and the construction company was an extension or renewal of the former lease.

It is contended by the construction company that the lease, which began July 1, 1928, was not a *"renewal or extension"* of the lease it had at the time its contract with the City and County of Honolulu was entered into, but was a *new* and *independent* lease and that therefore it was under no contractual obligation to furnish crushed rock to the city and county at a fixed price during the month of July, 1928, or any subsequent period. This contention is based on certain differences between the lease of July 1, 1918, and the lease of July 1, 1928. These differences are as follows: The former lease covered only 19.93 acres of land and was for a term of ten years. The later lease covers the same land and additional land, making a total of 47.91 acres and is for a term of five years. In the former lease the lessee agreed to pay an annual clear rent of $2500 "and the further rent or sum of ten cents (10c) for every cubic yard of every material of every description, nature or kind exclusive only of quarry waste and surface soil removed from or quarried or found on the land hereby demised in every year of the said term over and above the quantity of 25,000 cubic yards." In the later lease the lessee agrees to pay the

folowing rents: "yearly and every year during the said term unto the lessors as rent a royalty of twenty cents (20c) per cubic yard (loose measurement) for every material of every description, nature or kind, exclusive only of quarry waste and surface soil, removed from or quarried and found on the demised premises during said term, provided, however, that if the amount of such royalty shall in any year during said term be less than the sum of twenty thousand dollars ($20,000), the lessee shall make up the difference out of its own moneys." The later lease contains the following covenants to be performed by the lessee, which were not in the former lease: "That quarry waste, in the proportion of one cubic yard of such waste for every ten cubic yards of rock removed from the premises, shall be deposited and spread on the low land of Kapaakea belonging to the lessors lying mauka of Beretania Street, at such places and according to such grades as the lessors may, from time to time designate, such distribution of waste to keep pace with quarrying operations; that the lessors shall have preferential rights in the purchase of crushed rock, building stone and other material quarried or found on the land hereby demised, and that it, the lessee, will not, in the delivery of such materials from its quarry, accord to any other purchaser thereof any preferential rights over the lessors; that it will sell to the lessors for their buildings and other development work on other lands owned by them crushed rock, building stone and other material at the lowest price at which the lessee shall sell to any other purchaser."

We think these differences between the two leases should not be controlling if it reasonably appears from the entire contract between the city and county and the construction company that by the use of the words "renewal or extension" it was understood that they should include a new lease with different terms. It would be

unjust to construe them so narrowly as to exclude from them something which the parties intended should be included. This would be to give mere form precedence over substance. So that in order to correctly construe the words it is necessary to consider the entire contract and the situation of the parties at the time it was executed. The following clause of the contract indicates the spirit in which it should be construed: "This contract shall be liberally construed to effect the purpose of protecting the City and County of Honolulu in the matter of securing crushed rock for public work without the necessity of condemning, owning and operating the quarry site described in the pending action in eminent domain or in the lease, both as aforesaid. It shall apply so far as possible in any contingency which may arise owing to the superior action of any other governmental agency, Territorial or Federal." In *Guie* v. *Byers,* 164 Pac. (Wash.) 75, 77, the court said: "Since the words" ("renewal" and "extension") "are not 'words of art, and have no legal or technical significance,' they may mean whatever the parties intended when contracting."

At the time the contract was entered into there was pending in the circuit court a proceeding which, if prosecuted to a conclusion, would vest in the city and county a fee simple title to a portion of the land which the construction company was occupying and using under its lease from the trustees of the Bishop estate. As an inducement to forego its intention to acquire this land the construction company was willing and agreed with the city and county to furnish it with crushed rock at a certain price, not only during the term of its lease but also during any renewal or extension of it. It is thus apparent that it was contemplated by the contracting parties that the tenancy of the construction company might continue after the termination of the lease and so they contracted with

reference to such continuance as well as with reference to the term of the lease itself. They were aware that the lease contained no clause making it self-renewing or self-extending upon the same terms as those contained in the lease and therefore that if the construction company's tenancy should be continued it would of necessity be under another or new agreement with the lessors, the terms of which might be identical with those of the original lease or might be different. It seems clear to us under these circumstances that when the construction company agreed to furnish crushed rock at a stipulated price during any "renewal or extension" of its lease it was understood that the words "renewal or extension" meant during such term as the construction company might continue to occupy the premises under a lease from the trustees of the Bishop estate. This is but giving to the contract that liberal construction in favor of the city and county which the parties agreed should be given.

Moreover, this conclusion works no real hardship on the construction company. We do not understand from the argument and the briefs that it is contended by the construction company that if the new lease were in its essential terms the same as the old lease it would not be the equivalent of a renewal or extension of the old lease. Its contention is that it is because the two leases are essentially different that the later lease is not a renewal of the former one. The shorter term of the tenancy contained in the new lease can hardly be regarded an essential difference. The former lease was for ten years and the later one for five years. Since this would shorten the term of its contract with the city and county, with which the construction company seems to be dissatisfied, this difference is an advantage rather than a detriment to it. The increase of acreage in the new lease is likewise not a difference that injuriously affects the construction com-

pany. It is stipulated by the parties herein that the rock on the land included in both leases, namely, 19.93 acres, is not yet exhausted so that it is just as available for furnishing crushed rock to the city and county under the new lease as it was under the old lease. Whether, if the rock in this particular area becomes exhausted, the construction company would under its contract be obliged thereafter to furnish crushed rock to the city and county from the remaining portion of the land described in its present lease we do not decide. Neither, in view of certain provisions of the contract between the construction company and the city and county, to which we shall call attention, does the increased rental provided in the new lease materially affect the construction company. Nor, for the same reason, does its obligation to remove waste material and deposit it on other land owned by the Bishop estate at its own expense materially affect it. The argument of the construction company is that its obligation to pay an increased rental and its obligation in regard to waste material of necessity increase its cost of production and therefore if it is to make a reasonable profit on the material it furnishes the city and county it must charge more per cubic yard than the price stipulated in its contract. It was to meet just such contingencies as these and to insure to the construction company a reasonable profit that the provisions of the contract to which we have just referred were placed in it. The first clause of these provisions is as follows: "That either party, on or before June 15th or December 15th of any year during the term of said lease or of any renewal or extension thereof (being the term of this contract) may notify the other party in writing of a proposed modification of the prices stated herein or as the same may have been modified as herein provided; said notice shall state in detail the proposed modification and the reasons therefor and shall be de-

livered at the office of the Honolulu Construction and Draying Company, Limited, in the one case or in the hands of the city and county clerk or his deputy and addressed to the board of supervisors in the other case." Succeeding this clause is a complete plan of arbitration which becomes effective in the event the parties do not settle their differences regarding prices by mutual consent. The agreement to submit to the arbitration provided for and its purpose are thus expressed: "And said parties hereby covenant with each other as aforesaid that each will submit to the arbitration herein provided for on failure to agree to any modification proposed by the other party, it being the expressed intent hereof to secure reasonable prices for crushed rock for public use which will be stable during the term hereof, subject to modification not oftener than once in six months." With reasonable profits thus guaranteed the construction company as well as reasonable prices guaranteed the city and county we see no injustice in imputing to the words "renewal or extension" the meaning which we think the entire contract shows they were intended to bear.

In *Cunningham* v. *Pattee,* 99 Mass. 248, Pattee held, by assignment, a lease for six years on certain real estate at an annual rental of $1000. The lease contained no covenant of renewal or extension. Pattee's assignors had given a sublease to Catharine Cunningham which contained a renewal clause, which became binding on Pattee, to renew the lease to Mrs. Cunningham as their "leasehold estate in the premises may be renewed or extended." At the expiration of the lease which he held Pattee secured a new lease at an increased rent for a term of three years. Upon his refusal to grant Mrs. Cunningham a renewal of the lease which she held from his assignors she brought a suit in equity for specific performance of the agreement contained in her lease. Pattee sought to defend on the

ground, among others, that he had taken from the owners of the land a new lease with more onerous conditions than those embraced in the original lease and therefore, the new lease not being a renewal of the old lease, he was under no obligation to grant Mrs. Cunningham the renewal she demanded. In deciding this point the court said (p. 253): "But the fact that the covenantor has himself taken a new lease at an increased rent, or upon more onerous conditions than the first, will not relieve him from obligation to fulfil his own contract; nor will it justify charging an increased rent, or imposing greater burdens on the sublessee than those contained in the first lease to him. * * * The only way by which the obligation of such a covenant can be escaped is by the covenantor's abandonment of the estate, without a direct or indirect renewal of his own tenancy." In *Hausauer* v. *Dahlman,* 45 N. Y. S. 1088 (which was affirmed by the court of appeals in 163 N. Y. 567), the court said in its syllabus: "A lessee who sublets part of the premises with the privilege of renewal for a certain term in case he obtains from the superior landlord an extension of his lease is not relieved from his covenant because he obtained from the superior landlord a new lease, instead of an extension of the old one." These cases are in point because of the refusal of the courts to ascribe to the words "renewal or extension" such a narrow meaning as would defeat the purpose which the parties evidently had in mind when they were used. See also *Clifford* v. *U. S. Fidelity & Guaranty Co.,* 249 Pac. (Okl.) 938; *In re Allen's Estate,* 135 N. W. (Minn.) 812.

The construction company makes another contention with which we are unable to agree. This contention is based on a provision in its contract with the city and county which is inconsistent with a provision in the later lease. In the contract the construction company agreed

to give the orders of the city and county for crushed rock preference over all other similar orders. In the later lease from the trustees of the Bishop estate it agreed to give the preference to the Bishop estate. It is contended by the construction company that if it should be held that its contract with the city and county is still in force it will be placed in a position where, if it shall be required to do so, it cannot choose between the city and county and the Bishop estate without incurring a liability to its disappointed obligee. Since the construction company voluntarily placed itself in this position, and without the consent of the city and county, we think we should not be influenced thereby to wrongly construe its contract with the city and county in order to give it relief.

For the foregoing reasons it is our opinion that the City and County of Honolulu is under no legal obligation to pay to the Honolulu Construction and Draying Company the $443.55 involved in this proceeding.

*J. G. Anthony* (*Robertson & Castle* on the briefs) for plaintiff.

*C. E. Cassidy*, Deputy City and County Attorney (also on the brief), for defendant.